UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RALPH E. SCOTT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case no. 4:16cv80 PLC |
| | ) |
| NANCY A. BERRYHILL,[1] | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Ralph Scott seeks review of the decision of the Social Security Commissioner, Nancy Berryhill, denying his applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.[2] Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's applications.

*I.  Background and Procedural History*

On July 3, 2012 and July 10, 2012, Plaintiff filed applications for Disability Insurance Benefits and Supplemental Security Income alleging he was disabled as of October 15, 2011[3] as a result of severe back problems, five ruptured discs, and nerve pain. (Tr. 142-49, 74). The

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).
[2] The parties consented to the exercise of authority by the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (ECF No. 9).
[3] Plaintiff later amended the alleged date of onset to December 21, 2011. (Tr. 248-53)

Social Security Administration (SSA) denied Plaintiff's claims, and he filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 65-73, 95).

The SSA granted Plaintiff's request for review, and an ALJ conducted a hearing on May 5, 2014. (Tr. 33-64). At the hearing, Plaintiff testified that he was thirty-two years of age, had a ninth grade education, and earned his GED at age seventeen. (Tr. 39). Plaintiff lived with his wife and four children, ages six, seven, ten, and eleven. (Tr. 48).

Plaintiff testified that he originally injured his neck working at a sawmill.[4] (Tr. 42). Several years later, he received "outpatient epidural shots." (Id.). Although Plaintiff denied having any surgeries, Plaintiff's counsel directed the ALJ's attention to a medical record reflecting that Plaintiff underwent a percutaneous discectomy on April 14, 2010. (Tr. 52-53).

Plaintiff testified that his most recent employment was as a cook and delivery driver at a pizza restaurant for about three months. (Id.). Plaintiff stated that he could not perform his job because "I couldn't stand on my feet to do the cooking job." (Tr. 39). He explained that the pain was "severe" and "[i]t would go down my right leg, and I'd have cramps in my left shoulder that would prevent me from leaning into the oven." (Tr. 40). On days that the pain was "more severe, unbearable," he would stay home and "relax." (Id.). Plaintiff stated that lying down "would relieve the pressure…in my neck. But then I would start getting cramped up in my legs. So I would have to get up and move around." (Id.). Approximately every half hour, Plaintiff would "lay down for about 30, 45 minutes at a time. . . . [t]hroughout the day, all day." (Tr. 41). Plaintiff testified that, by the time of the hearing, this was a daily pattern. (Id.).

Plaintiff explained that the pain in his neck was "pretty much a constant cramp, where . . . the movements are real limited" and the pain "goes down to my left arm . . . into the thumb and

---

[4] The record reflects that Plaintiff's work-related injury occurred on March 19, 2017, and Plaintiff filed a workers' compensation claim. (Tr. 350).

2

the pinky finger." (Tr. 42). Plaintiff had difficulty gripping with his left hand and could only "do stuff with that arm" for thirty to forty-five minutes before needing to rest for forty-five minutes to an hour. (Tr. 42-43). Plaintiff could not straighten his left arm "all the way out" because there was "a pinched nerve that shoots pain down through my neck." (Tr. 43).

When the ALJ questioned Plaintiff about his back pain, Plaintiff stated that he had "a couple of ruptured discs and pinched nerves in the lower lumbar and the cervical spine" and the pain "radiates down the center of my back, down to my right hip, and down to the right leg." (Tr. 44). Plaintiff's right leg was "pretty much always cramped up" and "if it gets too cramped or sore, it'll start going numb." (Id.). Plaintiff took hydrocodone four times per day, which made him "lightheaded" and prevented him from driving "too much." (Tr. 44-45). Plaintiff also took Flexeril and gabapentin. (Tr. 45). Despite the Flexeril, Plaintiff continued to experience muscle spasms in his right leg which lasted "from a minute or two to 30, 40 minutes" and occurred every night. (Tr. 45). Plaintiff's primary care physician, Dr. Maynard, prescribed his pain medications. (Tr. 48). He did not have an orthopedist. (Id.).

Plaintiff testified that he was able to lift about ten pounds and could only walk twenty to thirty minutes and stand or sit for thirty to forty-five minutes. (Tr. 45-46). Plaintiff stated that he typically alternated between sitting in his recliner, lying on the couch, and walking around, explaining, "[m]oving around is just to get one pain to stop until another one starts to aggravate." (Tr. 47). Plaintiff drove his car "[m]aybe once a week to pick the kids up from school." (Tr. 49). Plaintiff tried to help his wife with household chores that did not require "too much bending over," such as folding laundry and rinsing dishes. (Tr. 50-51). On nights when Plaintiff's wife worked, "she'll have something already cooked and in the oven. And I just – I'll go turn the

oven on to reheat it." (Tr. 51). Plaintiff did not shop for groceries or do yard work. (Id.). He "used to have a little woodworking shop, but I can't get in there anymore." (Id.).

A vocational expert also testified at the hearing. (Tr. 56-63). The ALJ asked the vocational expert to consider a hypothetical individual with Plaintiff's work history who was

> limited to light work, except the individual can only stand and walk two hours of an eight-hour workday, would also need to be able to alternate positions every 45 minutes for a brief position change while continuing to work, would need to have no overhead reaching. . . no climbing of ladders, ropes, or scaffolds, and only occasional stooping and crouching; and no more than moderate exposure to work hazards such as moving machinery and unprotected heights. And no more than occasional gripping and fingering of the left non-dominant hand.

(Tr. 59). The vocational expert stated that such an individual could not perform Plaintiff's past relevant work and "would be limited to sedentary, unskilled occupations." (Tr. 60). The vocational expert opined that "there's only a handful of occupations that fall within that criteria," including surveillance system monitor and credit checker. (Tr. 60). When the ALJ expanded the hypothetical to allow "no more than frequent gripping and fingering with the nondominant hand," the vocational expert testified that the hypothetical individual could perform the additional jobs of document preparer, eyeglass polisher, and patcher. (Tr. 60-61). However, if the individual required a fifteen-minute break "every day on a consistent basis," he would be precluded from all unskilled, competitive employment. (Tr. 61).

In a decision dated August 6, 2014, the ALJ applied the five-step evaluation process set forth in 20 C.F.R. §§ 404.1520, 416.920[5] and found that Plaintiff "has not been under a

---

[5] To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920. Those steps require a claimant to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

4

disability, as defined in the Social Security Act, from October 15, 2011 through the date of this decision[.]" (Tr. 21-28). The ALJ found that Plaintiff had the following severe impairments: "history of displaced L4-5 dis[c] without myelopathy requiring decompression with residual lumbar radiculopathy; history of dis[c] protrusion C6-7[.]" (Tr. 23).

After reviewing Plaintiff's testimony and medical records and finding that he was "not entirely credible," the ALJ found that Plaintiff had the residual functional capacity (RFC) to:

> perform light work (lift or carry 20 pounds occasionally and 10 pounds frequently) . . . except: He can only stand and walk two hours of an 8 hour work day and would need to be able to alternate positions every 45 minutes for a brief position change while continuing to work at the work station. He can perform no overhead reaching and no climbing of ladders, ropes, or scaffolds. He can occasionally stoop and crouch. He can have no more than moderate exposure to work hazards such as moving machinery and unprotected heights. He can perform no more than frequent gripping of the left non-dominant hand.

(Tr. 24). Finally, the ALJ found that Plaintiff was unable to perform his past relevant work but could perform other jobs that existed in significant numbers in the national economy. (Tr. 26-27).

Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied review on December 7, 2015. (Tr. 1-5). Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the SSA's final decision. Sims v. Apfel, 530 U.S. 103, 106-07 (2000).

## II.  *Standard of Review*

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruze v. Chater, 85 F.3d 1320, 1323 (8th Cir. 1996) (quoting Boerst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). In determining whether the evidence is substantial, a court considers evidence that both supports

and detracts from the Commissioner's decision.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  However, a court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence."  Renstrue v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)).

"If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision."  Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011) (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  The Eighth Circuit has repeatedly held that a court should "defer heavily to the findings and conclusions" of the Social Security Administration.  Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001).

### III. *Discussion*

Plaintiff claims the ALJ erred in finding that he had the RFC to perform light work.  (ECF No. 22 at 16).  More specifically, Plaintiff contends that the ALJ improperly (1) weighed the medical opinion evidence and (2) assumed that, because Plaintiff had four children, he was capable of performing some work.  (Id. at 16-17).  Defendant counters that the ALJ properly weighed the opinion evidence and considered Plaintiff's activities of daily living along with other inconsistencies in the record.  (ECF No. 27 at 6-9).

#### A. *Medical opinion evidence*

Plaintiff argues that the ALJ erred in:  (1) assigning little weight to the opinion of Plaintiff's treating physician, Dr. Gregory Maynard; (2) assigning "partial weight" to the

consultative examiner, Dr. Dennis Velez, who reported that Plaintiff's lumbar symptoms were on the wrong side; and (3) failing to specify the amount of weight assigned to the opinion of another consultative examiner, Dr. David Volarich. (ECF No. 22). In response, Defendant asserts that the ALJ did not err in according little weight to Dr. Maynard's opinion because the opinion was inconsistent with his treatment notes. (ECF No. 27 at 8). Defendant further contends that any error in weighing Dr. Velez's opinion was harmless because "the ALJ found Plaintiff was much more limited" than Dr. Velez's opinion suggested. Finally, Defendant maintains that, even though the ALJ did not specify the amount of weight she assigned Dr. Volarich's opinion, the decision shows that the ALJ considered his opinion and accorded it significant weight. (Id. at 7-8).

   1. Dr. Maynard

Plaintiff claims the ALJ erred in assigning little weight to Dr. Maynard's opinion that Plaintiff's impairments might require him to recline on and off throughout the day. A treating source's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). If an ALJ declines to ascribe controlling weight to the treating physician's opinion, she must consider the following factors: length of treatment relationship and frequency of examinations; nature and extent of the treatment relationship; supportability of the opinion; consistency of the opinion with the record as a whole; and the doctor's specialization. 20 C.F.R. §§ 404.1527(c)(2)-(5), 416.927(c)(2)-(5). Whether the ALJ grants the treating physician's opinion substantial or little weight, "[t]he regulations require that

7

the ALJ 'always give good reasons' for the weight afforded to a treating physician's evaluation." Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005).

Plaintiff's earliest record of Dr. Maynard's treatment is from a follow-up appointment of December 21, 2011. (Tr. 365-70). At that appointment, Plaintiff reported that he had completed pain management treatment, which included multiple injections and five visits with Dr. Glenn Kunkel, "with improvement in [symptoms]." (Tr. 366). Plaintiff stated that his symptoms "have started to recur over the past 3-4 wks." (Tr. 367). Dr. Maynard noted: "Decreased sensation to right lateral thigh compared to left. Also L4 and L5 distributions on right. Decreased sensation to L4 distribution greater than L5." (Id.). Dr. Maynard diagnosed Plaintiff with chronic back pain and "lumbar radiculopathy, bulge of cervical disc without myelopathy," and he refilled Plaintiff's prescriptions for Flexeril and Vicodin. (Tr. 367).

At his follow-up appointment in January 2012, Plaintiff informed Dr. Maynard that he was experiencing "decent pain control on current meds" with "occasional radiation of neck pain to LUE. Describes C6/7 distribution." (Tr. 372-77). In his physical examination, Dr. Maynard wrote: "tender to palp at Thoracolumbar junction. No focal tenderness at LS region." (Tr. 374). Dr. Maynard prescribed Neurontin, Flexeril, and Vicodin. (Id.). At his follow-up appointments in February, March, and April 2012, Plaintiff reported "decent pain control on current meds" and Dr. Maynard noted "tender to palp at Thoracolumbar junction." (Tr. 379-84, 386-92, 393-98).

On June 23, 2012, Dr. Maynard completed a medical source statement (MSS), in the form of answers to interrogatories, relating to Plaintiff's condition. (Tr. 432-33). Although his answers are difficult to read, Dr. Maynard appeared to state that an MRI of October 2008 showed bulges at L4-5 with "possible mass affect L5 nerve root (right)." (Tr. 432). Dr. Maynard opined

that Plaintiff's alleged need to frequently alternate between sitting, standing, and reclining was "plausible." (Tr. 433).

In July 2012, Plaintiff informed Dr. Maynard that his "pain control is OK on current meds," and Dr. Maynard prescribed Vicodin, Flexeril, and Neurontin. (Tr. 399-405). In September 2012, Dr. Maynard wrote that Plaintiff's "pain control is OK overall on current meds," and in December 2012, Dr. Maynard noted "[d]ecent pain control on current meds." (Tr. 452-53, 455-56).

Plaintiff saw Dr. Maynard four times in 2013 and once in 2014. (Tr. 457-58, 459-60, 461-62, 463-64, 465-66). In March 2013, Dr. Maynard switched Plaintiff from Vicodin to Norco and, at Plaintiff's subsequent appointment in June 2013, Plaintiff informed Dr. Maynard that he was "taking less pills overall." (Tr. 458, 459). At his appointments in June, August, and November 2013 and February 2014, Plaintiff reported "[d]ecent pain control," and Dr. Maynard refilled his prescriptions. (Tr. 459-60, 461-62, 463-64, 465-66). In all of his physical exams, Dr. Maynard noted that Plaintiff was "tender to palp at Thoracolumbar" spine. (Tr. 452-53, 455-56, 457-58, 459-60, 461-62, 463-64, 465-66).

The ALJ reviewed Dr. Maynard's treatment records dating back to late 2011 and noted that, "[t]hrough late 2012, Dr. Maynard prescribed taking Gabapentin, Flexeril, and Hydrocodone, and the claimant reported the medications helped with rest." (Tr. 25). The ALJ wrote: "The claimant saw Dr. Maynard only four times in 2013, for medications, and once in 2014, noting 'decent pain control' with the treatment. He did not try any non-medication modalities, as suggested." (Tr. 25).

9

In regard to Dr. Maynard's June 2012 MSS, the ALJ took issue only with Dr. Maynard's finding that "it was plausible that [Plaintiff] would need to alternate sitting, standing and reclining throughout the day." (Tr. 26). The ALJ wrote:

> [N]othing from the treating specialists suggests the claimant needs to recline. Instead, they recommended a multi-facet rehabilitation program for the claimant, which has not been begun. Instead, Dr. Maynard prescribes medications and encourages rest, contrary to the specialists' advice. There is cervical radiculopathy noted by Dr. Maynard, but his focus of treatment has been on the claimant's back. There are no hand complaints noted in his treatment records. His records do not document abnormal objective clinical findings for the claimant, only pain complaints.

(Tr. 26). Based on the absence of either treatment notes or objective evidence supporting Dr. Maynard's suggestion that Plaintiff might have to alternate positions throughout the day, the ALJ concluded: "his opinion cannot be given controlling weight and must be given little weight." (Id.).

Plaintiff argues that the ALJ erred in failing to apply the factors set forth in 20 C.F.R. § 404.1527. (ECF No. 22 at 18). As an initial matter, the Court notes that "[w]hile an ALJ must consider all of the factors set forth in 20 CFR § 404.1527(d), [s]he need not explicitly address each of the factors." Derda v. Astrue, Case No. 4:09cv1847 AGF, 2011 WL 1304909, at *10 (E.D.Mo. March 31, 2011).

Although the ALJ did not specifically refer to the factors in § 404.1527(c), she touched upon most of them in her opinion. The ALJ noted that Dr. Maynard was Plaintiff's family physician and that his opinion was not supported by the records from Plaintiff's treating specialists. (Tr. 26). See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) ("The Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). The ALJ also explained that Dr. Maynard's opinion was not supported by his treatment notes, which

10

"[did] not document abnormal objective clinical spinal findings for the claimant, only complaints." (Tr. 26). See Reed, 399 F.3d at 921 ("We have upheld an ALJ's decision to discount a treating physician's [medical source statement] where the limitations listed on the form 'stand alone,' and were 'never mentioned in [the physician's] numerous records of treatment' nor supported by any 'objective testing or reasoning.'"). Finally, as the ALJ noted in her decision, Dr. Maynard's notes from 2013 and 2014 revealed that Plaintiff's pain was controlled by medication. See Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir. 2009) (discrediting a treating physician's opinion that was inconsistent with his treatment records). The Court finds substantial evidence in the record to support the ALJ's decision to assign little weight to Dr. Maynard's opinion.

2. Dr. Velez

Plaintiff next argues that the ALJ erred in giving partial weight to the opinion of Dr. Velez, a consulting physician who examined Plaintiff on September 8, 2012 and incorrectly reported that Plaintiff's symptoms were on the left, rather than the right, side of his body. (ECF No. 22 at 20-21). Defendant counters that, even if Dr. Velez's opinion deserved no weight, "it is of no significance to the outcome of the decision because the ALJ found Plaintiff was much more limited." (ECF No. 27 at 9).

Unless the ALJ assigns controlling weight to a treating physician's opinion, the ALJ must explain the weight given to every medical opinion of record, regardless of its source. See 20 C.F.R. §§ 404.1527(c), (e)(2)(ii); 416.927(c), (e)(2)(ii). When determining the appropriate amount of weight to give a medical opinion from a non-treating source, the ALJ considers the following factors: examining relationship, treatment relationship, supportability, consistency, and

specialization. Wiese v. Astrue, 552 F.3d 728, 731 (8th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)).

Dr. Velez's physical examination of Plaintiff yielded mostly normal findings. (Tr. 408-12, 414-15). Dr. Velez noted that Plaintiff had no dysmetria, a negative Romberg's test, and normal stance, normal gait, and rapid alternating movements. (Tr. 411). Dr. Velez found Plaintiff showed "slight weakness of the hand grip on the left side when compared to right," but "normal sensation to both light touch and pinprick in both upper and lower extremities." (Id.). Plaintiff had "non-obtainable reflexes in the Achilles on the left hand side when compared to the right," but "the rest of the reflex examination is normal." (Tr. 411). Dr. Velez observed that Plaintiff "could squat and rise from that position with some slight difficulty and can bend over and touch his toes with slight disturbance of rhythm on extension," and he could walk on his heels and on his toes and tandem walk "very slowly." (Id.).

Dr. Velez diagnosed Plaintiff with cervical and lumbar radiculopathy. (Id.). Dr. Velez stated that Plaintiff's radiculopathy "seems to affect. . . either the L5 or the S1 nerve roots on the left hand side" and "either C6 or C7…affecting the left upper extremity." (Tr. 411-12). Dr. Velez concluded that Plaintiff "would have no limitations with sitting, standing, but would have limitations with walking within two-thirds of the time." (Tr. 412). Dr. Velez further found that, "[d]espite his radicular symptoms on the upper extremity, . . . he will have no limitations in lifting, carrying, or manipulative limitations." (Id.).

The ALJ acknowledged that Dr. Velez "indicates the lumbar symptoms were on the wrong side," but found that "such error is not material and does not detract significantly from the report." (Tr. 26). The ALJ assigned Dr. Velez's only partial weight because she believed the claimant had more lifting, standing, and walking restrictions than Dr. Velez suggested. (Id.).

12

Importantly, the ALJ gave only "partial weight" to Dr. Velez's opinion and included in the RFC considerably more limitations than Dr. Velez found necessary. Contrary to Dr. Velez's finding that Plaintiff had no limitations on standing and was capable of walking two-thirds of the workday, the ALJ included in the RFC a limitation to "only stand and walk two hours of an 8 hour work day" and required Plaintiff "be able to alternate positions every 45 minutes[.]" (Tr. 24). Furthermore, even though Dr. Velez found no limitations on lifting or carrying, the ALJ restricted Plaintiff to lifting or carrying twenty pounds occasionally and ten pounds frequently. (Id.).

Moreover, the Court notes that Plaintiff did not identify any harm resulting from the ALJ's alleged error in giving too much weight to Dr. Velez's opinion. "To show an error was not harmless, [a plaintiff] must provide some indication that the ALJ would have decided differently if the error had not occurred." Byes v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012). Upon review of the record and the ALJ's decision, the Court finds that the ALJ evaluated all of the evidence of record and provided good reasons for the weight she accorded Dr. Velez's opinion.

3. Dr. Volarich

Finally, Plaintiff urges the Court to remand this case because the ALJ failed to state what weight, if any, she gave the opinion of Dr. Volarich, a consulting physician who examined Plaintiff in relation to an earlier workers' compensation claim. (ECF No. 22). Defendant acknowledges that the ALJ did not specify the weight given Dr. Volarich's opinion but argues that "the decision shows that the ALJ accorded the opinion significant weight." (ECF No. 27 at 7).

The record contains the last two pages of a four-page physical evaluation completed by Dr. Volarich on October 1, 2010. (Tr. 350-51). Dr. Volarich found that Plaintiff suffered a "disc bulge at C6-7 without radicular symptoms" and "disc protrusions with annular tears at L4-5 and L5-S1, all of which required non operative treatment." (Tr. 350). Dr. Volarich stated that Plaintiff would benefit from "modalities including but not limited to narcotics and non-narcotic medications (NSAID's), muscle relaxants, physical therapy, and similar treatments," as well as "treatments at a pain clinic because of his lumbar syndrome." (Tr. 350-51). Dr. Volarich also listed restrictions "[w]ith regard to work and other activities referable to the spine." (Tr. 351).

The ALJ discussed Dr. Volarich's opinion in her decision. (Tr. 25). The ALJ noted that Dr. Volarich attributed Plaintiff's disc problems to a work injury and "suggested that the claimant would require ongoing pain management using narcotic and non-narcotic medications, muscle relaxers, physical therapy, an exercise program, and similar treatment." (Tr. 25). The ALJ further wrote:

> [Dr. Volarich] opined that the claimant should avoid repetitive bending, twisting, lifting, pushing, pulling, carrying, and climbing, or remaining in a fixed position for any more than about 60 minutes at a time; and that he should not lift more than 30 pounds, handle any weight over his head or away from his body, or carry weight over long distances or uneven terrain.

(Tr. 25). However, the ALJ did not explicitly explain the amount of weight she assigned to Dr. Volarich's opinion.

The limitations the ALJ included in the RFC are, in fact, more restrictive than those identified by Dr. Volarich. Specifically, the ALJ limited Plaintiff to lifting or carrying no more than twenty pounds occasionally and ten pounds frequently and required he be able to alternate positions every forty-five minutes. (Tr. 24). Additionally, while Dr. Volarich included no

14

restrictions on Plaintiff's use of his hands, the ALJ limited Plaintiff to "no more than frequent gripping of the left-dominant hand." (Id.).

Plaintiff correctly asserts that the ALJ did not comply with 20 C.F.R. 404.1527(e) when he failed to specify and explain the weight he gave Dr. Volarich's opinion. However, an ALJ's failure to explain the specific weight given to a medical opinion does not necessarily require reversal. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (finding that the limitations included in the RFC indicated that the ALJ gave "some credit" to a physician's medical opinions). Because the ALJ discussed Dr. Volarich's opinion and the limitations included in the RFC are more restrictive than those identified by Dr. Volarich, it is evident that the ALJ gave the opinion some weight or significant weight. See Potter v. Colvin, No. 4:12CV1002 SPM, 2013 WL 4436247, at *11 (E.D.Mo. 2013); Kresyman v. Astrue, No. 09-00507-CF-W-NKL, 2010 WL 670248, *5-6 (W.D.Mo. 2010).

Upon review of the record and the ALJ's decision, the Court finds that the ALJ evaluated all of the evidence of record and provided good reasons for the weight she accorded Dr. Maynard's, Dr. Velez's, and Dr. Volarich's opinions. Because substantial evidence in the record as a whole supported the weight given to their medical opinions, the Court will not disturb those determinations.

### B. *Activities of daily living*

Finally, Plaintiff argues that the ALJ improperly found Plaintiff was able to care for his four children and was therefore capable of performing sedentary work. (ECF No. 22 at 21). Defendant counters that Plaintiff's ability to care for his children was only one factor that, along with several inconsistencies in the record, weighed against Plaintiff's allegations of disability. (ECF No. 27 at 6).

In his adult function report of July 23, 2012, Plaintiff stated that he lived with his fiancée[6] and their four children. (Tr. 228). Plaintiff stated that he was able to fix himself and the children "easy meals like cereal or sandwiches," but was no longer able to cook. (Tr. 229). He also wrote that, while he could not "lift or carry very much," he tried "to help with sweeping or folding laundry or any light chores I can" and he shopped for groceries about two times per month. (Tr. 229-30). He added that his fiancée "helps me with everything I do." (Tr. 229). Plaintiff wrote: "I used to do all the mechanical work to our vehicles, maintenance to our house, work to the yard, and worked a fulltime job to pay the bills. Now I find it hard and sometimes impossible to do simple daily chores." (Tr. 234).

At the hearing, Plaintiff testified that, because he took hydrocodone every four hours, he could not drive often. (Tr. 45). Plaintiff stated he drove "maybe once a week to pick the kids up from school." (Tr. 79). Plaintiff tried to help with chores, such as folding laundry and rinsing dishes, "[a]nything that doesn't require too much bending over[.]" (Tr. 51). Plaintiff did not do yard work or shop for groceries. (Id.). When his wife worked nights, she would prepare dinner in advance and leave it in the oven for him to reheat. (Id.).

In her decision, the ALJ discredited Plaintiff's allegations of disability because, among other reasons, Plaintiff had neither "attempted careful rehabilitation, as recommended" nor sought "to increase his strength, as recommended by [Dr. Volarich] and [Dr. Velez]." (Tr. 26). Additionally, the ALJ wrote: "Because his wife works and there are four young children at home, the claimant clearly demonstrates that he can do sedentary work, due to the demands required in meeting the demands of children. There is no evidence that he requires any outside help with the children." (Id.).

---

[6] The record variously refers to the mother of Plaintiff's children as Plaintiff's "fiancé" and "wife."

16

It is well-established that a claimant "need not prove [he] is bedridden or completely helpless to be found disabled." Reed, 399 F.3d at 923 (internal quotation marks omitted). Nonetheless, an ALJ may consider a claimant's activities of daily living inconsistent with his allegations of disabling impairment and consider such activities when judging the credibility of subjective complaints. See McDade v. Astrue, 720 F.3d 994, 998 (8th Cir. 2013).

Plaintiff cites evidence that he was limited in his ability to care for his children and his household, but the record also includes evidence that he was able to complete such activities. Plaintiff was able to shop for groceries, drive occasionally, prepare simple meals, and perform some household chores. While Plaintiff's wife worked full time, Plaintiff stayed home with the couple's four children under the age of twelve. The ALJ did not err in finding that Plaintiff's ability to care for his children while his wife worked undermined his allegation of total disability. See KKC ex rel. Stoner v. Colvin, 818 F.3d 364, 370 (8th Cir. 2016) (evidence that claimant was able to look after his children, among other activities of daily living, supported the ALJ's finding that his impairment did not meet or equal the listing requirement); Roberson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007) (substantial evidence supported ALJ's denial of disability benefits in part because claimant "engaged in extensive daily activities," including taking care of her child, driving, preparing meals, performing housework, shopping for groceries, handling money, and visiting family); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996) (affirming ALJ's discount of claimant's subjective complaints of pain where claimant was able to care for one of his six children on a daily basis, drive a car infrequently, and go grocery shopping occasionally).

## IV. *Conclusion*

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled. Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED.**

A separate judgment in accordance with this Memorandum and Order is entered this date.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of June, 2017